IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 30, 2011

## NELSON TROGLIN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bledsoe County**
**No. 64-2007      Thomas W. Graham, Judge**

**No. E2010-01838-CCA-R3-PC - Filed October 11, 2011**

The petitioner, Nelson Troglin, appeals the post-conviction court's denial of his petition for post-conviction relief from his attempted first degree murder conviction, arguing that he received the ineffective assistance of counsel at trial, at the motion for new trial, and on appeal. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Samuel F. Hudson, Dunlap, Tennessee, for the appellant, Nelson Troglin.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of attempted first degree murder by a Bledsoe County Circuit Court jury and was sentenced to twenty-four years in the Department of Correction. On direct appeal, this court affirmed the judgment of the trial court and the Tennessee Supreme Court denied his application for permission to appeal. See State v. Nelson Troglin, No. E2005-02015-CCA-R3-CD, 2006 WL 2633107 (Tenn. Crim. App. Sept. 14, 2006), perm. to appeal denied (Tenn. Jan. 29, 2007). The underlying facts of the case were recited by this court on direct appeal as follows:

This case arises from the attempted murder of the victim, Mike Stafford. At the [petitioner]'s trial, the State and the [petitioner] stipulated to the following:

> If Jamey Roberson, the Circuit Court Clerk, was called to testify, Your Honor, he would testify that his occupation, he is the Circuit Court Clerk; that it['s] his duty to file pleadings in court cases, such as indictments and so forth; that he would testify that [the petitioner] was indicted for the homicide of Ralph Wilkey on July 27, 1998, by the Bledsoe Grand Jury.
>
> He would also testify that that case on March 16, 1999, was set for trial for September 21, 1999. He would also testify that [the victim, Mike Stafford,] did testify at that trial against [the petitioner]. That will be the proof in that case-I mean, if Mr. Roberson was called to testify.

Howard Upchurch testified that he represented the [petitioner] for the charges brought against the [petitioner] for the homicide of Ralph Wilkey. He said that, at the end of April of 1999, he provided the [petitioner] with a list of witnesses that the State intended to call at the Wilkey trial and that Mike Stafford's name was on that list. Upchurch further testified that Stafford testified against the [petitioner] during the [petitioner]'s trial for Wilkey's homicide. On cross-examination, Upchurch explained that as a criminal defense lawyer he routinely receives a list of State witnesses and that he shares such lists with his clients.

Joe Johnson testified that he has known both the [petitioner] and the victim, Stafford, all of his life. He said that, on the Thursday before the victim was shot, the [petitioner] told him that Stafford was on the [petitioner]'s "list." Johnson explained that the [petitioner] often joked about different people, so he did not tell the victim or the police what the [petitioner] had said. On cross-examination, Johnson testified that Stafford is his first cousin. He acknowledged that he did not know exactly what the [petitioner] meant when he made the statement about the victim being on his "list."

Elizabeth Summers testified that she grew up with the [petitioner], that she has known Stafford for years, and that she has known a man named Dennis Cagle throughout his entire life. She testified that, at 10:30 p.m. on May 2, 1999, she went to her job at Nyla's Place, a gas station and

convenience store. During her shift, which lasted from 11:00 p.m. on May 2, 1999, until 7:00 a.m. on May 3, 1999, neither the [petitioner] nor Cagle came to her store. Stafford, however, entered the store alone at around 11:40 p.m. on May 2, 1999, and purchased a twelve-pack of beer and two packs of cigarettes. Willie Mae Pendergrass and Eddie Tollett were present when the victim entered the store. Summers testified that, about twenty minutes after Stafford came to Nyla's Place, she heard, via a police scanner, that Stafford had been shot. On cross-examination, Summers testified that Stafford's purchase of beer and cigarettes from Nyla's Place was not an unusual event, and, at the time of his purchase, he did not look afraid or upset.

Willie Mae Pendergrass testified that her sister owns Nyla's Place, and Pendergrass was at the store from 7:00 or 7:30 p.m. on May 2, 1999, until 3:00 or 4:00 a.m. on May 3, 1999. She said that, during this time, she did not see the [petitioner], whom she has known for fifteen years, but she did see Stafford at the store on May 2 at around 11:30 or 11:45 p.m. Pendergrass testified that, while she was still at Nyla's Place at around 12:00 a.m., she heard that Stafford had been shot. On cross-examination, Pendergrass testified that she had not seen Stafford in the store during late night hours before and that Stafford rushed in and out of the store.

Dennis R. Cagle testified that he has known the [petitioner] for most of his life and that the [petitioner] is his friend. He said that, in May of 1999, he lived with Victoria Dodson on Brockdale Mountain, and, on May 2, 1999, at around 9:30 or 10:00 p.m., the [petitioner] drove to his house and asked him to drive the [petitioner] to get something to eat. Cagle noted that the [petitioner] had been drinking alcohol, and Cagle agreed to drive the [petitioner] into town. He testified that they went to the McDonald's in town, which is a thirty to thirty-five minute drive, they drove around for a while, and then they went to Nyla's Place to get some beer. He could not recall exactly when they arrived at Nyla's Place and agreed that they may have arrived there after 11:00 p.m. He said that the [petitioner] got out of the vehicle, but he did not actually see the [petitioner] go into the store. When the [petitioner] returned to the vehicle, he said that the store would not sell him beer. Cagle testified that the [petitioner] told him that Stafford could purchase beer from the store.

The [petitioner] gave Cagle Stafford's address, and they drove to Stafford's house where the [petitioner] exited the vehicle and knocked on Stafford's front door. Cagle testified that a female, whom he did not

recognize, came to the front door and spoke with the [petitioner], and then a few minutes later Stafford came to the door. He said that Stafford and the [petitioner] appeared to be talking, and then they got into Cagle's truck, they all drove to Nyla's Place, and Stafford entered the store. He testified that he did not see the [petitioner] give Stafford any money for the beer, but Stafford came back from the store with some beer and got into the truck. He testified that they all drank and drove around.

Cagle testified that the three men went to the Veteran's Club ("VFW") because the [petitioner] had to use the restroom. They parked in a dimly lit area, and all three men exited the truck. Cagle said that he stood on the driver's side of the truck while the [petitioner] and Stafford stood on the passenger's side of the vehicle, talked for awhile, and then started walking towards the back of the VFW. He testified that he did not know whose idea it had been to go back to the VFW, and then he acknowledged that he had previously told David Emiren, a former Tennessee Bureau of Investigation ("TBI") agent, that the [petitioner] asked Stafford to go to the back of the VFW. Cagle said that he started to follow them, the [petitioner] told him to go back to the truck, and Cagle went back and sat down in the truck. He said that Stafford and the [petitioner] were gone behind the VFW for "a few minutes," and then he heard two shots. He then saw Stafford run from behind the VFW towards Stafford's house, and he heard Stafford make "some kind of unintelligible statement," which he described as "more or less a moan or a groan." He explained that, as he watched Stafford run, the [petitioner] got back in the pickup truck.

Cagle testified that he never saw a weapon and that he did not see anyone else at the VFW. Cagle asked the [petitioner] what had happened, and the [petitioner] replied that he "shook him up a little." Cagle testified that, when asked, the [petitioner] denied shooting Stafford. The [petitioner] said, "Let's go home," and they went back to Cagle's house, which took about thirty-five minutes, and the two did not speak as they drove. Cagle said that, when they returned to his house, Dodson was there, and Cagle took a shower while the [petitioner] sat on his couch and ate a hamburger. Cagle testified that he did not know if the [petitioner] went to the [petitioner]'s vehicle before he entered Cagle's home.

Cagle said that, while he was in the shower, Dodson came to the bathroom door and told him that Ed Wooden was at their home and wanted to speak with him. Cagle went to the kitchen door and asked Wooden to come

-4-

inside, and Wooden replied that he would wait on Cagle. Cagle thought that Wooden could not see the [petitioner] inside Cagle's house from where Wooden was standing, so he assumed that Wooden did not know that the [petitioner] was inside. Cagle left with Wooden and went to the jail to speak with the police.

Cagle testified that, the day after Stafford was shot, he provided Agent Emiren with a statement and denied saying anything untruthful. He explained that, on the night of the crime, both he and the [petitioner] drank a lot of alcohol and that he did not want to tell the agent anything more than necessary. Cagle testified that he owned a forty-five caliber pistol and that, on May 2nd or 3rd of 1999, the pistol was in Barney Nerrgaurd's pickup truck. He testified that, later, Agent Emiren returned and asked Cagle about this forty-five pistol, both he and Agent Emiren shot his gun, and the agent retrieved some hulls from the pistol. Cagle said that Agent Emiren returned to Cagle's house again and asked Cagle for his gun, and he told Agent Emiren that he had traded his gun for a rifle at a gun store. Cagle identified a weapon presented by the State and testified that it was the gun that he had owned when the crime had occurred. Cagle denied loaning the weapon to the [petitioner] at any time prior to the victim's shooting and denied ever seeing the [petitioner] in possession of this pistol.

On cross-examination, Cagle acknowledged that he had a dispute with Stafford in the past but testified that this dispute was not a "big deal." He testified that, on the night of the crime, he had consumed "a couple of six-packs" of beer prior to the [petitioner]'s arrival at his house. When the [petitioner] arrived, he seemed like he was in a good mood and did not appear to be hiding a weapon. Cagle further testified that they did not discuss Stafford or the [petitioner]'s upcoming trial for Ralph Wilkey's homicide. Cagle said that no one threatened Stafford before he got into Cagle's truck. He acknowledged that he was intoxicated the first time that he provided Agent Emiren with a statement. Cagle denied possessing a weapon on the night of the crime but acknowledged that he had a pruning saw in his truck. Cagle testified that the [petitioner] never expressed any intent to kill Stafford, and he never said that he tried to kill Stafford.

On redirect examination, Cagle said that, at the time of the crime, he also owned a twelve gauge shotgun and a thirty-eight revolver, and the thirty-eight was kept inside Dodson's purse. He said that he never saw the [petitioner] with the thirty-eight revolver and that he did not think that the

-5-

[petitioner] knew that Dodson had that gun.  On recross-examination, Cagle testified that it was pretty dark at the VFW and that he turned the headlights off when the men were standing outside the truck.

Victoria Gossett Dodson testified that she has lived with and dated Cagle for six years.  She said that on Sunday, May 2, 1999, the [petitioner], a friend whom she has known all her life, came to their home at around 9:30 or 9:45 p.m.  She said that the [petitioner] had been drinking alcohol, but he was not drunk, and he asked Cagle to take him to town to go to McDonald's and to get some more beer.  She estimated that Cagle and the [petitioner] left the house no later than 10:00 p.m. and that she saw the men again about two or two and a half hours later.  She said that the [petitioner] seemed more intoxicated when the men returned and, while Cagle had consumed a few beers before the men left her home, he did not appear drunk.  She said that, after the men returned to her house, Cagle took a shower, the [petitioner] sat on her couch and ate a hamburger, and no one engaged in any conversation about Stafford.

Dodson said that she heard someone pull into her driveway, so she looked outside and saw Wooden and some men at her back porch.  Wooden asked her if Cagle was home, and she told him that Cagle was just getting out of the shower and invited Wooden and the men who accompanied him to come inside, but the men said that they would wait outside for him.  Cagle then went outside to speak with the men.  Dodson testified that Wooden and the men who accompanied him could not see the [petitioner] from where they stood, that she did not tell these men that the [petitioner] was in her home, but the men pulled in right behind the [petitioner]'s car.  She said that the [petitioner] remained in her home while Cagle left with Wooden to answer some questions.

Dodson said that she asked the [petitioner], "What's going on?" and that he replied, "We shot [Stafford]."  She asked the [petitioner] who shot Stafford, and he said that he shot Stafford once and that Cagle shot him twice.  She said that the [petitioner] told her to call the hospital to see if Stafford was dead, which she did and learned that Stafford had been transferred to another hospital.  The [petitioner] asked her to call that hospital to see if Stafford was dead, which she did and learned that Stafford was going to have surgery to repair the damage from his gunshot wounds.  She told the [petitioner] what she had learned, and the [petitioner] told her, "He needs to die and go on.  He needs to die and go on."  Dodson testified that she asked the [petitioner] why

-6-

this had happened, and the [petitioner] did not respond and appeared to pass out on the couch.

Dodson testified that the police later called her on the telephone and said that they were coming back to her house to get the [petitioner], which they did and arrested the [petitioner]. She thought that she showed Agent Emiren her thirty-eight pistol. Dodson testified that Cagle owns a forty-five pistol, but he did not have it with him on the night of the crime. She said that she spoke with Agent Emiren the day after the crime had occurred, but she was not completely truthful with him because she was scared that she might get Cagle into trouble. She said that she did not tell the agent that the [petitioner] had said that Stafford needed to die on the night of the crime because she was trying to protect Cagle and the [petitioner]. She said that, later, she told Agent Emiren what the [petitioner] had said.

On cross-examination, Dodson testified that she loved Cagle and that she would hate to see him go to the penitentiary. She said that she and Cagle rode on four-wheelers on the day of the crime and finished riding about ten minutes before the [petitioner] came over to their house. She acknowledged that two full years passed before she told Agent Emiren that, on the night of the crime, the [petitioner] had said that Stafford needed to die. She testified that she drank alcohol on the night of the crime, that she takes Xanax, and that she should not mix alcohol with her prescriptions. She said that the [petitioner] never threatened her or her family. She said that, after these events had occurred, she searched her entire home for a pistol but could not find one.

Virginia Wright Stafford testified that, at the time of trial, she was married to Stafford, the victim, and that she has lived with him for the past twelve years. She described her home's location in relation to Nyla's Place and the VFW. She explained that one can get to the VFW from her house by crossing through her neighbor's yard and then going through a hayfield. She testified that she has known the [petitioner] as an acquaintance since she first started dating Stafford. She said that the [petitioner] came to her home between 10:00 and 10:30 p.m. after she had gone to bed, Stafford answered the door, and she heard the [petitioner] ask Stafford to leave the house. She went to the door and saw the [petitioner] standing there, and Stafford left with the [petitioner]. She did not recall at what hour Stafford returned to their residence, but, when he returned, he told her to call 9-1-1 because the [petitioner] had shot him. She said that Stafford was bent over, holding his

side, and told her that he was dying. She called 9-1-1 and Gary Johnson, a police officer with the Pikeville Police Department, arrived at her home and took Stafford to the Bledsoe County Hospital. She said that he stayed at this hospital for approximately two hours and that he was then transported to the UT Hospital in Knoxville where he stayed for approximately twenty days. On cross-examination, she denied knowing about any disagreements between Stafford and Cagle. She acknowledged that Stafford drank and that he was apparently able to buy beer on Sundays. She testified that, when she saw the [petitioner] at the door, no one acted suspiciously, and she did not see any weapons.

Steven Michael ("Mike") Stafford, the victim, testified that he lives with and is married to Virginia Wright Stafford. He said that he has known the [petitioner] his entire life and that Ralph Wilkey was his brother-in-law. Stafford testified that, after Wilkey's death in 1998, he provided the police with some information regarding the [petitioner] and that he served as a witness for the State in a homicide case brought against the [petitioner]. Stafford said that, on Sunday, May 2, 1999, the [petitioner] came to his porch door and asked him to take the [petitioner] to get some beer. He agreed, the [petitioner] gave him twenty dollars, and he went to Nyla's Place with Cagle and the [petitioner] to buy the beer. Stafford saw Nyla's sister, Willie Mae Pendergrass, in the store, and he purchased the beer and went back to the truck. He said that the [petitioner] asked him to ride around and drink a beer and that he declined the invitation because he had to awake at 3:00 a.m. to take his wife to work. He said that the [petitioner] said, "Well, can't you ride with us and just drink one beer?" He agreed to this proposition, and they went to the VFW.

Stafford testified that he did not know why they went to the VFW and that the VFW was closed, so they stood outside talking. Stafford explained that the [petitioner] went behind the building to go to the bathroom and then hollered at him, asking him to come around the building. Stafford testified that he and Cagle started to go around the building, and the [petitioner] said, "Not you, Denny, just Mike." Stafford testified that Cagle stayed by the truck in front of the building, and Stafford walked around the building. He said that he stood about three feet from the [petitioner], and the [petitioner] asked him, "[Y]ou think they'll do anything to me about Ralph?," and he replied, "I think they . . .," and then the [petitioner] shot him three times. Stafford testified that he could not see the gun in the [petitioner]'s hand because of how the [petitioner] was standing, but he could tell that the [petitioner] was aiming at

-8-

him when the [petitioner] shot the gun. He testified that the first gunshot hit him just below his right nipple and exited below his left shoulder blade. Stafford described how he ran around the building, went across the parking lot, went into some bushes, and then he had to sit down. He said that he was in pain and felt like he had been shot more than once. He did not recall seeing Cagle when he ran, and he was scared that the [petitioner] and Cagle were working together.

Stafford said that he ran to his home and arrived at the first step of his residence, and then he picked up an item and threw it against the wall to get his wife's attention. Stafford thought that he told his wife that the [petitioner] had shot him and told her to call 9-1-1. He said that Officer Johnson arrived, that his wife put him in the officer's car, and the officer took him to a hospital. From there, he went to another hospital in Knoxville, had surgery, and he stayed there for about two weeks. Stafford acknowledged that he had previously received a ticket for presenting a false identification, and that, in 1995, he pled no contest to improper influence of a jury.

On cross-examination, Stafford acknowledged that Cagle had accused him of raiding Cagle's marijuana patch. He said that, on the night of the crime, he was not surprised when Cagle arrived at his house because Cagle was with the [petitioner]. He said that the [petitioner] never threatened him over the course of the evening, and the [petitioner] did not seem to be hiding a weapon. Stafford testified that he did not see what kind of gun the [petitioner] used to shoot him. He said that, before the [petitioner] called him to walk around the building, the [petitioner] had not asked him about the Wilkey case. When asked if he told Officer Johnson that the [petitioner] and Cagle shot him, he testified that he could not recall because he was weak and "out of it."

Officer Gary Johnson testified that he was employed with the Pikeville Police Department on Sunday, May 2, 1999, and that the sheriff's department received a call about a shooting during the early morning hours of May 3, 1999. He said that he went to the victim's residence, and, when he arrived, he saw Stafford bent over on his steps. Stafford told Officer Johnson that he was going to die and that the [petitioner] had shot him, and the officer took Stafford to the hospital and could see blood coming from Stafford's back. On cross-examination, Officer Johnson testified that he never interviewed Cagle about the incident. He acknowledged that Stafford said that both the [petitioner] and Cagle shot him. He testified that he did not know if anyone

ever performed a gunshot residue test on the [petitioner] or Cagle.

David Emiren, a former agent with the TBI, testified that he investigated the victim's shooting and that he went to the VFW on May 3rd, at around 5:30 a.m., where he took photographs of the area and found a forty-five caliber hull that had been expended from a weapon and landed behind the VFW. He testified that he was unable to find a weapon or the bullet that went through the victim. The agent testified that he went to Cagle's residence to find out about Cagle's guns and that Cagle said that he owned a forty-five pistol but that gun was located elsewhere. Agent Emiren explained that, later, he found the weapon in a store that Cagle had traded firearms with and that he took some test shots with this weapon. He testified that this weapon expended forty-five hulls and that he retrieved the hulls from this gun, and they were compared against the hull that was found at the crime scene. The agent testified that he was the officer that investigated Ralph Wilkey's death, that Stafford was a witness for the State, and that Stafford testified against the [petitioner]. He acknowledged that the [petitioner]'s car was at Cagle's residence, that he searched the [petitioner]'s car, and that he did not find a weapon inside.

On cross-examination, Agent Emiren acknowledged that Stafford was not the only individual on the State's witness list in the Wilkey case and that he and about a dozen other people were on the list. He testified that he did not perform a gunshot residue test on Cagle. The agent acknowledged that he knew that Cagle was at the crime scene when he conducted his investigation, and he explained that, according to his understanding, Cagle was not the alleged shooter. He acknowledged that almost two years had passed before he tested Cagle's forty-five to see if it produced a hull that matched the one discovered at the crime scene. He explained that, when he conducted his investigation, Cagle said that the weapon that ejected the forty-five hull was in Barney Neergaurd's truck. Agent Emiren testified that he searched the [petitioner]'s vehicle and that he could not find a weapon inside. He did not recall if he found a witness list inside the [petitioner]'s vehicle. On redirect examination, Agent Emiren testified that Stafford was an important witness for the State in the trial for the charges brought against the [petitioner] for Wilkey's murder.

Dinnah Caluag, a TBI firearms examiner, testified that she examined a forty-five pistol that Agent Emiren had submitted to the lab. She explained that this weapon uses forty-five caliber cartridges, and she explained how the

-10-

gun operates and that it ejects cartridge cases that are also referred to as hulls. She identified a cartridge case that was submitted to the lab and collected from the crime scene, and two other cartridge cases that Agent Emiren gave to her. She explained that a gun makes certain markings on a hull when it is fired and that she compared the hull taken from the crime scene with the other two hulls that Agent Emiren had given to her. She testified that the hull from the crime scene could have been fired from the forty-five pistol Agent Emiren submitted, but the other hulls did not have sufficient markings to determine from what weapon they had been fired.

Richie Dykes and Teresa Smith testified that, on the day the victim was shot, Cagle had fired a pistol, possibly a forty-five, two or three times over the top of Jeremy Davis's truck. Smith testified that the [petitioner] is her uncle and that she went to Dykes's residence to look for hulls because she thought that the [petitioner] had been set up. Smith acknowledged that she testified as a witness for the [petitioner] in the Wilkey trial.

The [petitioner] testified that he is friendly with both Cagle and the victim, but he had heard that Cagle and Stafford had problems with each other in the past. He testified that, on the day of the crime, he went to his brother Buck's house, drank some beer, and then went to Cagle's house. He testified that he had loaned Cagle one hundred dollars, and he went to Cagle's house to collect the money. He said that, when he arrived at Cagle's house, Cagle asked him to go with Cagle to Dunlap to get some hamburgers and beer, and the [petitioner] agreed. The [petitioner] testified that Cagle drove to the McDonald's, but it was closed, so they went to the Golden Gallon to get some beer. The [petitioner] testified that Cagle's girlfriend, Dodson, was in the kitchen when they returned to Cagle's house, and Cagle went into another room and said, "I'll be back" and was gone for about an hour and a half. The [petitioner] thought that Cagle was going to his father's house because Cagle's father was sick and lived next door. The [petitioner] said that he sat down on Cagle's living room chair, and when Cagle finally returned, Cagle had showered but, he did not appear to need a shower.

The [petitioner] denied seeing Stafford on the night of the crime and said that he did not leave Cagle's house until the police took him into custody. The [petitioner] testified that he had seen the gun that was entered into evidence several times before at Cagle's residence. He testified that he did not own a gun like the one that had been entered into evidence, that he does not own a forty-five, and that he did not own a forty-five on the day of the crime.

He denied going to his car when they returned to Cagle's house. He said that, when the deputies arrived at Cagle's residence, they said who they were, and they asked to speak with Cagle. He acknowledged that, once the deputies left with Cagle, he could have left Cagle's residence. The [petitioner] testified that he did not leave and that the police officers later took him into custody. He testified that he is right-handed and that he can shoot a pistol with his right hand.

On cross-examination, the [petitioner] acknowledged that his thumb and his index finger are his only working right-hand fingers and that his pinkie finger and ring finger are his bad fingers. The [petitioner] explained that, if he had problems using his right hand, then he could not have worked at his job. The [petitioner] said that, on the day of the crime, he spoke with his brother and Dennis Johnson. He said that he saw these people during the day and that he went to Cagle's residence at around 9:00 or 9:30 p.m. He said that Cagle had owed him money for a couple of months, and he did not know why he chose to retrieve his money from Cagle on that particular day. The [petitioner] testified that he sat and watched television when Cagle left his home at around 11:30 p.m. after they returned from their trip to town.

The [petitioner] said that Cagle called the Sheriff when he returned, at around 12:30 a.m., and asked who had gotten shot in Bledsoe County. Cagle told him that Cagle heard about the shooting on a scanner, but he did not have a scanner. The [petitioner] acknowledged that he knows Wooden personally and that he did not go to talk to Wooden when the police officers arrived at Cagle's residence. The [petitioner] said that he figured that the police officers would come and speak with him if they wanted to talk to him. He testified that he had no reason to speak with the officers even though he had heard that somebody had been shot. The [petitioner] acknowledged that he stayed at Cagle's house after Cagle left with the police even though he did not know if Cagle would return. He denied telling Dodson that he shot Stafford and that Stafford needed to die. The [petitioner] said that Dodson did not use the phone while he was at Cagle's house.

The [petitioner] acknowledged that Upchurch represented him in the Ralph Wilkey case and that he received a list of State witnesses in the mail, and he went over the list with Upchurch. He acknowledged that he knew that Stafford was on this witness list, but he did not recall telling Joe Johnson that Stafford was on his "list." He further testified that he did not say that Stafford was on his list and that Johnson's statements are incorrect. The [petitioner]

-12-

testified that Virginia Wright Stafford was mistaken when she said that she saw the [petitioner] knocking at her door. He also testified that the victim's testimony that the [petitioner] shot him is incorrect and that he did not tell Dodson that he shot the victim.

State v. Nelson Troglin, No. E2005-02015-CCA-R3-CD, 2006 WL 2633107, at *1-9 (Tenn. Crim. App. Sept. 14, 2006), perm. to appeal denied (Tenn. Jan. 29, 2007).

On October 22, 2007, the petitioner filed a *pro se* petition for post-conviction relief, and, following the appointment of counsel, an amended petition was filed. In the petitions, the petitioner raised, among other things, numerous allegations of ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing, at which the petitioner's trial counsel testified that he represented the petitioner in his attempted first degree murder case. At that time, the petitioner had recently been convicted in another homicide case. Even so, counsel said that it never crossed his mind that there was not much he could do since the petitioner was going to be serving a long sentence regardless of the outcome in the present case.

Counsel testified that at the time of his representation, he had conducted "[o]ver a hundred" trials and was very familiar with the need to thoroughly investigate a case and call witnesses. Counsel said that he met with the petitioner two or three times in preparation for trial. During their meetings, counsel and the petitioner discussed the facts of the case, range of punishment, and the possible testimony of, and the petitioner's opinions concerning, the potential witnesses, including Teresa Smith, Richie Dykes, Victoria Dodson, and Denny Cagle. According to counsel, the petitioner "did not mince words" when talking about the witnesses. In particular, the petitioner said that Denny Cagle had killed two people in the past and that Dodson took medication for mental health issues.

Counsel testified that the petitioner expressed his desire for a continuance at least twice and initially wanted a change of venue as well. However, the petitioner later changed his mind and wanted to be tried in Bledsoe County. The petitioner also expressed his desire for counsel to withdraw from the case. Counsel stated that he and the petitioner discussed the need for a mental evaluation, and the petitioner agreed to get one.

Counsel testified that they discussed the petitioner's first trial and talked about how the petitioner thought the victim was a violent person. The petitioner asserted to counsel that he had "been had" in his first trial because the judge "rushed the jury for the 4th of July." The petitioner told counsel that Richard Wooden was the most damaging witness in the first trial and "if he was going to shot somebody, he'd have shot [Wooden]."

Counsel explained to the petitioner his right to testify and possible impeachment, and the petitioner decided that he did not want to testify. Counsel stated that he discussed trial preparations with the petitioner and noted that he had hired an investigator. They discussed self-defense and accident as possible defenses, but the petitioner claimed an alibi defense. The petitioner's alibi was that he stayed at Denny Cagle and Victoria Dodson's house while Cagle left; however, "there was no one else that could back that up." Counsel could not recall whether he interviewed Dodson before trial but said that he usually tried to interview every witness he could find.

Counsel said that he interviewed Denny Cagle and Elizabeth Summers, and he read the petitioner memos from those interviews. Counsel testified that the victim initially refused to talk to him, but counsel was able to successfully interview him within a week of the trial. Counsel said that he conducted a phone interview of Teresa Smith and called for Richie Dykes but was unable to speak to him.

Asked if he cross-examined Victoria Dodson about whether the petitioner remained at her house while Cagle left for a time, counsel said that nine years had elapsed and he could not remember. However, he asserted that the record would reflect the nature of his questioning and that his line of questioning would have depended on how Dodson testified on direct examination. He acknowledged that it would have been important to know Dodson's version of the facts prior to trial from either an interview or through the discovery from the State. Counsel said that he did not think that anyone who was not on the witness list was interviewed regarding there being "bad blood" between the victim and Cagle.

Counsel testified that there was an issue right before trial where a friend or relative of the petitioner indicated that one of the jurors was overheard saying, in front of other people, something along the lines of "just hanging [the petitioner] and getting on with it[.]" Counsel said that he brought the allegation to the court's attention but did not move for a mistrial because "without some proof that there had been tainting, it's not going to be granted."

Counsel testified that he received a list of the members of the jury pool prior to trial, but he did not recall whether he went through the list with the petitioner, and his notes were silent on the matter. He said that he "might very well have" made a notation in his notes had he gone over the list with the petitioner and had the petitioner indicated a problem with any of the potential jurors. Counsel acknowledged that "[i]t can be" a usual trial preparation to discuss the jury pool with one's client. However, counsel, not being from Bledsoe County, met with a local attorney, who went through the list of potential jurors with him. He and the local attorney discussed the potential jurors' backgrounds and any problems they may have had. Counsel filed a motion for individual sequestered voir dire so he could question the

potential jurors individually in the jury room.

Counsel testified that the petitioner was not tried in prison clothes because he remembered the trial being delayed due to the petitioner's being brought from the jail in his prison clothes and having to wait for the petitioner's family to bring his civilian clothes. Counsel said that he did not request a charge of voluntary intoxication because the petitioner had been insistent that he was not present during the crime and he "could [not] play it both ways with the jury." Counsel could not recall whether he mentioned the alibi defense in his opening statement but said that, if he did not, it was a strategy "in case any of the state witnesses backed up on their stories."

Counsel testified that if he did not cross-examine Cagle, Dodson, and the victim regarding the petitioner's alibi defense, it was because they all testified that the petitioner was present at the scene of the crime and counsel had to focus on attacking their credibility. Specifically, counsel asked Dodson about her use of Xanax and alcohol; he "went more on attacking their perceptions."

Counsel testified that the petitioner thought that all of the witnesses were "liars" and if counsel had "known how to prove that they were lying [he] would have done it." Counsel noted that he did a criminal history check of the victim. Counsel recalled that there were questions concerning Cagle's involvement in the shooting, but he did not interview people in the community regarding why Cagle would have been involved in a shooting of the victim.

Counsel testified that he withdrew as the petitioner's attorney prior to the hearing on the motion for new trial. He acknowledged that he and the petitioner had issues with each other and "exchanged words a lot of times." Counsel noted that the day he arrived to argue the motion for new trial, he discovered that the petitioner had filed a civil suit against him for monetary damages, which bothered counsel because he had worked very hard on the petitioner's case. Counsel said that the petitioner was "the most difficult client" he had ever represented, and the petitioner had a bad inmate advisor. Counsel recalled that he would send informative letters to the petitioner throughout the process, and every letter "would be turned around . . . [and] used against [him]." The petitioner wrote to the Board of Professional Responsibility with complaints against counsel.

Counsel testified that, as a result of his difficulties with the petitioner, he attempted to withdraw, pretrial, on a couple of occasions. After he successfully withdrew following the trial, counsel and appellate counsel had some communications with one another at the courthouse but did not have a sit-down interview. Counsel did not testify at the motion for new trial hearing. Counsel sent the case file to the petitioner and "probably" told appellate

counsel that the file was the property of the petitioner and he could refer to it as necessary.

On cross-examination, counsel testified that another attorney, "first counsel," represented the petitioner in the petitioner's other case that resulted in a second degree murder conviction. The petitioner also asserted an alibi defense in that case. Counsel said that, in the present case, he knew from reviewing the Jencks material and his interviews that the witnesses were going to completely contradict the petitioner's alibi defense. Further, the only witnesses the petitioner provided were ones who would say that Denny Cagle owned a .45 caliber gun and had shot it recently. However, the .45 caliber gun presumably belonging to Cagle was tested by the TBI and determined not to be the murder weapon.

Counsel testified that the petitioner was not always forthcoming with counsel, and counsel would "ha[ve] to keep trying to drag stuff out of him." Counsel said that the petitioner was present during voir dire and consulted during the process. In particular, counsel's notes reflected that the petitioner wanted a certain potential juror on the jury but then later claimed that "we should not have kept [the juror] on there[.]" Regarding his not mentioning the alibi defense in his opening statement, counsel agreed that divulging things to the State in opening statement could hamper the trial. Counsel said that the petitioner "waffled" on whether he wanted to testify, which was also a reason to not address in opening statement what the petitioner would or would not say. Counsel stated that he was not surprised by anything said by the witnesses, and he did not know of anything he could have done differently that would have affected the outcome of the case. Moreover, counsel did not think that any further consultation or conversations with the petitioner would have been helpful because "nothing new came out any time that [they] spoke . . . after the first time."

Appellate counsel testified that he represented the petitioner at the motion for new trial hearing and on appeal. Prior to conducting the motion for new trial hearing, appellate counsel met with trial counsel "a time or two" at the courthouse and retrieved the file from him. Appellate counsel was aware that the petitioner had filed a complaint against trial counsel with the Board of Professional Responsibility. One of the grounds alleged for relief was the acrimonious relationship between the petitioner and trial counsel. Appellate counsel recalled that it was the petitioner and his inmate advisor's idea to include ineffective assistance of counsel as a ground for relief in the motion for new trial, and appellate counsel was against it. The petitioner was strongly advised not to pursue ineffective assistance of counsel in his motion for new trial or on direct appeal. However, at the petitioner's insistence, appellate counsel "put on what proof was suggested," framing the issue around the "bad relationship" between the petitioner and trial counsel. Appellate counsel did not call trial counsel as a witness at the motion for new trial hearing because trial counsel never indicated that the poor relationship prevented him from being effective. Appellate counsel

felt that to have trial counsel testify would be counter-productive, so he "figured that was our best advantage . . . to frame it from [the petitioner]'s standpoint and leave [trial counsel] off the stand saying, [']oh, I still did my best and I didn't have any problem.[']"

Appellate counsel testified that he received no indication from the petitioner that he wanted a witness called to testify that was not called. Appellate counsel acknowledged that the petitioner's inmate advisor sent him a letter asking that he subpoena trial counsel to testify at the motion for new trial hearing. However, he explained that the letter was written close to a year before the motion for new trial was filed, and he tried to convince, and hoped, during the interim "that they would give up on this idea of pursuing ineffective assistance of counsel [on] direct appeal."

Appellate counsel testified that he was concerned that if they only raised one ground of ineffective assistance of counsel, the other grounds would be waived. Counsel said that "all [he] knew to do was try to explain it as thoroughly and as clearly as [he] could to [his] client, if [the petitioner] rejected [his] theory, then [he] put in there what [the petitioner] requested[.]" Even though appellate counsel raised ineffective assistance of counsel on direct appeal, he did not include it as a ground in his application for permission to appeal to the Tennessee Supreme Court because he "didn't think it was a good issue to take up to the supreme court" as he did not think it was a good issue to have been raised in the first place. Appellate counsel stated that, even though he did not think ineffective assistance of counsel was a strong claim to raise on direct appeal, that did not negatively impact the effort he put into proving the claim because it tied in with the animosity between the petitioner and trial counsel and how the court erred in not granting trial counsel's motion to withdraw.

The petitioner testified that trial counsel met with him two times prior to trial, and the visits were not very long. The petitioner did not believe that counsel was interested in his case at all. The petitioner said that he explained to counsel that the victim and Denny Cagle "had been into it for a number of years over drugs," but he did not know whether counsel ever investigated that relationship or any of the other witnesses. The petitioner stated that he and counsel had a bad relationship because counsel "just didn't do his job," and counsel had represented the victim and one of the witnesses in other matters. Asked what counsel should have done differently, the petitioner said that counsel "should have come off [his] case," should have met with and communicated with him more often, and should have talked to him before the motion for new trial.

The petitioner testified that he and trial counsel never sat down prior to trial and discussed the list of potential jurors and, had they gone over the list, the petitioner would have been able to provide information that would have avoided the juror problems that occurred in the trial. The petitioner stated that he tried to talk to counsel about who he

-17-

wanted counsel to interview and how he wanted to be defended, but counsel "didn't listen to [him]" and "didn't represent [him] the way it ought to be represented in court." The petitioner said that he did not "trust [trial counsel] in no way."

With regard to appellate counsel's representation, the petitioner testified that he did not tell appellate counsel, or have his inmate advisor tell appellate counsel, to raise the issue of ineffective assistance of counsel on direct appeal. The petitioner said that he cannot read and write so he depends on what his inmate advisor communicates for him. The petitioner said that he never had a conversation with appellate counsel regarding raising the issue of ineffective assistance of counsel on direct appeal, but then later said that he actually told appellate counsel that ineffective assistance of counsel was an issue that should not be pursued on a direct appeal.

On cross-examination, the petitioner admitted that the two witnesses he claimed he wanted trial counsel to talk to were Dennis Cagle and Victoria Dodson, both of whom were either interviewed or procured a statement from prior to trial. He did not know of any other witness names he gave trial counsel to interview. With regard to the selection of the jury, the petitioner acknowledged that he was sitting beside counsel throughout the process but said that counsel did not ask his opinion on every juror. The petitioner said that he did not tell trial counsel that he specifically wanted to keep the one particular juror with whom he later alleged a conflict. He stated that he was drunk the night of the offense and that was why he wanted counsel to get a voluntary intoxication charge even though he maintained that he was not present during the offense. With regard to appellate counsel's testimony regarding raising the issue of ineffective assistance of counsel, the petitioner said that appellate counsel lied in his testimony. He also said that appellate counsel "misrepresented [him] in court by not calling [his] witnesses . . . on the motion for new trial."

In denying the petition, after reviewing the standard of review, the post-conviction court found that neither attorney performed in such a way to "breach the standard of care, but even if there were something that breached the standard of care, . . . [none] of these alleged errors were such that . . . the verdict in the trial would have been otherwise." The court further commented that the petitioner's "credibility is suspect" and explicitly resolved any conflicts in the testimony in favor of trial counsel and appellate counsel.

## ANALYSIS

On appeal, the petitioner argues the post-conviction court erred in finding that he received effective assistance of counsel. Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann.

§ 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those

choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

## Allegations Against Trial Counsel

The petitioner argues that trial counsel rendered ineffective assistance by failing to "adequately meet with [him] to adequately prepare the case for trial" and not listening to him at their meetings. He asserts that, had counsel met with him more often and "actually listened to him," trial counsel would have reviewed the list of potential jurors and also learned background information on the State's witnesses that could be used for impeachment. The petitioner also asserts that trial counsel was ineffective for failing to interview Victoria Dodson prior to trial and for not "effectively pursu[ing] the defense strategy of [the petitioner]'s alibi."

The Post-Conviction Procedure Act provides in pertinent part:

> (f) Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.
>
> . . . .
>
> (h) A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Tenn. Code Ann. § 40-30-106(f), (h) (2006).

We initially note that the petitioner's claim of ineffective assistance of trial counsel was previously determined by this court on direct appeal and cannot be relitigated in a

post-conviction proceeding, even though the petitioner may not have made the same allegations on direct appeal that he now makes in his post-conviction petition. See Ronald Yates v. State, No. W2008-02067-CCA-R3-PC, 2009 WL 4505436, at *3 (Tenn. Crim. App. Dec. 3, 2009); Jay Homer Chambers v. State, No. E2004-01862-CCA-R3-PC, 2005 WL 2346974, at *2 (Tenn. Crim. App. Sept. 26, 2005); John Earl Scales v. State, No. M2003-01753-CCA-R3-PC, 2004 WL 1562542, at *6-7 (Tenn. Crim. App. July 13, 2004), perm. to appeal denied (Tenn. Nov. 8, 2004); Russell Lane Overby v. State, No. W2001-01247-CCA-R3-PC, 2002 WL 818250, at *2 (Tenn. Crim. App. Apr. 26, 2002), perm. to appeal denied (Tenn. Sept. 9, 2002). This court has previously noted that raising a claim of ineffective assistance of counsel on direct appeal is "fraught with peril." Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). Ineffective assistance of counsel is "a single ground for relief" under the post-conviction statute, even though the violation may be established by multiple acts or omissions. Id. (citations omitted).

In any event, trial counsel testified to his preparations for the petitioner's case, including his interactions with the petitioner, interviewing the witnesses, and his utilization of the petitioner's requested alibi defense. The post-conviction court accredited the testimony of counsel over that of the petitioner's "suspect" testimony. From our review, we fail to see any deficiency in counsel's performance or, moreover, how any alleged deficiency would have changed the outcome of the case.

**Allegations Against Appellate Counsel**

The petitioner argues that appellate counsel rendered ineffective assistance for failing to call trial counsel as a witness at the motion for new trial hearing. In addition, he asserts that, if this court finds that his various allegations of ineffective assistance of trial counsel are waived due to appellate counsel's raising ineffective assistance on direct appeal, then appellate counsel was also ineffective for raising one allegation of ineffective assistance without raising the other possible allegations of ineffective assistance.

With regard to appellate counsel's failure to call trial counsel as a witness at the motion for new trial hearing, appellate counsel testified that he strategically decided to not call trial counsel as a witness at the motion for new trial hearing because trial counsel never indicated that his poor relationship with the petitioner prevented him from being effective, and appellate counsel felt that to have trial counsel testify would be counter-productive. Appellate counsel explained that he thought it would be to the petitioner's advantage to present the issue solely from the petitioner's viewpoint. Based on our review, we cannot conclude that this strategic decision on the part of appellate counsel constituted deficient performance, nor do we see how the outcome would have been different if trial counsel had testified to the apparent poor relationship between him and the petitioner.

As to the petitioner's allegation that appellate counsel was ineffective in raising the issue of ineffective assistance of counsel, appellate counsel testified that he was afraid that the petitioner would waive all grounds of ineffective assistance of counsel by raising one ground on direct appeal, and both appellate counsel and the district public defender strongly advised the petitioner to not pursue the issue. However, the petitioner insisted, so counsel raised the issue as framed by the petitioner. As explained by appellate counsel: "My concern was you raise one issue, you've raised them all. But all I knew to do was try to explain it as thoroughly and as clearly as I could to my client, if he rejected my theory, then I put in there what he requested I put in there." Again, the post-conviction court accredited appellate counsel's testimony. Therefore, we discern no deficiency on the part of counsel. Moreover, as indicated above, even if the petitioner's other allegations of ineffective assistance of trial counsel were not deemed previously determined, we conclude that he would not be entitled to relief. Thus, there was also no prejudice caused by appellate counsel's actions.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE